**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **PATRICK HENRY JOFFRION, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 12-0434-WS-M** |
| | ) |
| **ALLSTATE INSURANCE CO., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the Court on the motion of the defendants (collectively, "Allstate") for partial summary judgment. (Doc. 77). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 77-81, 87-89, 93), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion for partial summary judgment is due to be granted in part and denied in part.

## BACKGROUND

According to the complaint, (Doc. 1), the plaintiffs ("Linda" and "Patrick") were in their vehicle when it was struck from behind while stopped in interstate traffic. The accident, which was the fault of the other driver, caused the plaintiffs to experience various economic and physical damages in an amount beyond the limits of the other driver's insurance. Defendant Allstate Insurance Company ("AIC") insured the plaintiffs under an automobile policy and an umbrella policy, both of which provide uninsured/underinsured motorist ("UIM") coverage. According to the amended

complaint, (Doc. 44), the policies were issued by defendant Allstate Property and Casualty Insurance Company ("APCIC").[1]

The plaintiffs assert causes of action for breach of contract and bad faith. The defendants seek summary judgment as to the bad faith claim and as to certain aspects of the contract claim.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id.* "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.*; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the

---

[1] In granting the plaintiffs' motion for leave to file an amended complaint, the Court instructed the plaintiffs to file "an entire, integrated pleading." (Doc. 42 at 1 n.1). Their "first supplemental and amending petition for damages," however, appears to be a partial pleading, since it omits many of the allegations of the original. Moreover, while the body of the amended pleading alleges that both policies were issued by APCIC, the style of the amended pleading identifies AIC as the only defendant. This confusion is precisely the reason the Court ordered the plaintiffs to file an entire, integrated amended complaint. Because AIC and APCIC assume they are both defendants, (Doc. 77 at 1), the Court does likewise.

non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Bad Faith.

Allstate offers several reasons this claim should be dismissed: (1) the plaintiffs' claim has not been denied; (2) the plaintiffs have not shown they are legally entitled to

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

collect the full amount of damages claimed; and (3) Allstate had a debatable reason for denying the plaintiffs' claim. (Doc. 77 at 2). The Court considers these arguments in turn.[3]

## A. Denial.

There can be no viable claim for bad faith refusal to pay an insurance claim until the insurer has denied the claim. *E.g., State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 317 n.6 (Ala. 1999).[4] Without explanation, Allstate asserts that it has not denied the claim of the plaintiffs and that they cannot prove otherwise. (Doc. 78 at 2, 10, 22, 39). Allstate's only record citation is to the plaintiffs' response to Interrogatory 10, which simply lists elements of the plaintiffs' damages. (*Id.* at 10 n.61; Doc. 80-6 at 8-9).[5] The Court cannot discern, and Allstate does not explain, how a listing of damages could negate a denial of the plaintiffs' claim. Allstate thus has failed to carry its initial burden of showing the plaintiffs cannot establish the existence of a denial.

The subject accident occurred in May 2010. The plaintiffs' earliest known correspondence with Allstate concerning the accident is dated March 15, 2011. (Doc. 89-2 at 16). On March 1, 2012, Allstate offered to settle the plaintiffs' UIM claim for $6,000. (Doc. 88-2 at 64). In its reply brief, (Doc. 93 at 10), Allstate correctly points out that a denial of a claim can be either express or constructive. *E.g., Slade*, 747 So. 2d at 293 n.6. Allstate assumes the plaintiffs argue that Allstate's offer was so low as to constitute a constructive denial, and it responds that "research failed to reveal any

---

[3] Allstate also argues the plaintiffs cannot show that Allstate failed to investigate or to subject the results of its investigation to cognitive review. (Doc. 77 at 2). Because it is unnecessary to the proper resolution of the instant motion, the Court pretermits consideration of this argument.

[4] All parties assume that Alabama law governs all issues herein. The Court does likewise.

[5] In filing their exhibits, both sides repeatedly clumped multiple exhibits within a single attachment. This unfortunate practice prevents the Court from citing particular exhibits with adequate clarity, necessitating the unorthodox citation method utilized herein.

Alabama decisions equating what the Joffrions claim to be a 'paltry offer' as [sic] a constructive denial." (Doc. 93 at 10).

Several responses are in order. First, because Allstate did not carry its initial burden in its principal brief, no burden passed to the plaintiffs to establish that, or explain why, a denial occurred. Second, the plaintiffs did not describe the $6,000 offer as a denial of the claim but as a "refusal to reasonably settle." (Doc. 87 at 27). Third, the plaintiffs did not renounce any argument in favor of a denial other than the making of a lowball offer. (*Id.*). Fourth, Allstate's failure to find authority supporting the proposition that a lowball offer can constitute a denial is not the equivalent of proof that a denial cannot be based on a lowball offer, nor does it pass any burden to the Court to find such proof. Fifth, Allstate admits that a constructive denial can be found when "the passage of time is so great that the delay alone creates a denial," *Slade*, 747 So. 2d at 317 n.6, yet it cites no authority for the proposition that a year (more precisely, 352 days) is too short a time to satisfy this test. Similarly, Allstate admits that a constructive denial can be found based on "sufficient delay in payment coupled with some wrongful intent by the insurance company," *id.*, yet it makes no effort to show that the plaintiffs cannot establish a denial under this test.

For all the foregoing reasons, Allstate is not entitled to summary judgment on the grounds that it has not denied the plaintiffs' claim.

## B. Legal Entitlement to Recover.

"[T]here can be no breach of an uninsured motorist contract, and therefore no bad faith, until the insured proves that he is legally entitled to recover." *Quick v. State Farm Mutual Automobile Insurance Co.*, 429 So. 2d 1033, 1035 (Ala. 1983). This prerequisite to bad faith liability stems from Section 32-7-23 of the Alabama Code, which requires automobile policies to include UIM coverage "for the protection of persons insured thereunder who are legally entitled to recover damages" from uninsured owners or operators. *See LeFevre v. Westberry*, 590 So. 2d 154, 156-57 (Ala. 1991) (explaining the

genesis of the term).  An insurer presumably could elect to use language more favorable to the insured, but the policies at issue here mirror the statutory language.  (Doc. 81 at 30, 50).

The "legally entitled to recover" standard requires that the insured "must be able to [1] establish fault on the part of the uninsured motorist, which [2] gives rise to damages, and must be able to prove [3] the extent of those damages." *Quick*, 429 So. 2d at 1035 (emphasis, internal quotes omitted); *accord Ex parte State Farm Mutual Automobile Insurance Co*., 893 So. 2d 1111, 1115 (Ala. 2004).  That is, the insured must "prov[e] a lack of insurance on the part of the tort-feasor; the tort-feasor's legal liability; proximate cause; and damages," including "the extent of his damages." *LeFevre*, 590 So. 2d at 162.

This threshold burden is placed on the insured because, although he is seeking benefits under his own policy, he is seeking benefits based on the wrongdoing of a third party, and the insurer may resist payment on substantive grounds "that would have been available to the uninsured motorist." *State Farm Mutual Automobile Insurance Co. v. Bennett*, 974 So. 2d 959, 962 (Ala. 2007) (internal quotes omitted).  "Thus, until the liability of the uninsured motorist has been determined, the insurer and insured occupy an adversary position toward each other." *Quick*, 429 So. 2d at 1035.  Their positions remain adverse "until the uninsured motorist's liability is fixed; therefore, there can be no action based on the tort of bad faith based on conduct arising prior to that time, only for subsequent bad faith conduct." *LeFevre*, 590 So. 2d at 159.

The Alabama appellate courts have repeatedly rejected bad faith claims in the UIM context because the insured had failed to show the insurer "the extent of his damages" proximately caused by the uninsured motorist's conduct.  In *Quick*, summary judgment was properly entered in favor of the insurer because "the evidence proves that the amount of damages had not been determined." 429 So. 2d at 1035.  In *LeFevre*, summary judgment was properly entered because the plaintiff "offered no proof of the amount of State Farm's liability under the uninsured motorist provision until after State

Farm had tendered its entire policy limits." 590 So. 2d at 162. In *Aetna Casualty and Surety Co. v. Beggs*, 525 So. 2d 1350 (Ala. 1988), where the insured had been killed in an accident, a plaintiff's verdict was reversed because "[t]here [was] nothing in the record to show that the plaintiff supplied Aetna with any evidence of the amount of [damages] that would have been assessed against the uninsured tort-feasor if a homicide case had been presented to a jury." *Id*. at 1352. In *State Farm Mutual Automobile Insurance Company v. Smith*, 956 So. 2d 1164 (Ala. Civ. App. 2006), a plaintiff's verdict was reversed since, "[b]ecause Smith had not established the extent of his damages and because State Farm disputed whether all the damages claimed by Smith were attributable to the May 1997 accident, State Farm's decision not to authorize payment of all or part of Smith's UM/UIM benefits could not have amounted to bad faith." *Id*. at 1170.

Note that the insured must "prove" to the insurer that he is legally entitled to recover[6] and that the insurer is potentially exposed to bad faith liability only if it fails to pay after receiving this proof.[7] While "the legislature did not intend that the insured would have to sue and receive a judgment in his or her favor before bringing an action alleging bad faith," *LeFevre*, 590 So. 2d at 160, proof requires evidence, not mere assertion. Thus, in *Quick*, there was no bad faith where "the evidence proves that the amount of damages had not been determined" before suit was filed. 429 So. 2d at 1035. In *Beggs*, there was no bad faith where "[t]here is nothing in the record to show that the plaintiff supplied Aetna with any evidence of the amount" of damages. 525 So. 2d at

---

[6] *Quick*, 429 So. 2d at 1035 ("[T]here can be no breach …, and therefore no bad faith, until the insured *proves* that he is legally entitled to recover.") (emphasis added); *Beggs*, 525 So. 2d at 1352-53 ("[I]t is doubtful that an insured could ever *prove* the amount of an insurer's liability under uninsured motorist coverage in a wrongful death case with the specificity necessary to recover against an insurer for bad faith in failing to negotiate or pay a wrongful death claim under uninsured motorist coverage.") (emphasis added); *LeFevre*, 590 So. 2d at 158 ("Undoubtedly, in some cases the insured could *prove* the amount of the insurer's liability with the specificity necessary to recover against an insurer for bad faith ….") (emphasis added).

[7] *Id*. at 159 ("[T]here can be no action based on the tort of bad faith based on conduct arising prior to that time [before "the uninsured motorist's liability is fixed"], only for subsequent bad faith conduct.").

1352.  And in *LeFevre*, there was no bad faith where the plaintiff "offered no proof of the amount of State Farm's liability" until after the insurer had offered policy limits.  590 So. 2d at 162.

The insured, in short, cannot set up a bad faith claim merely by demanding payment.  Instead, he must present the insurer with evidence supporting the demand.  How much evidence?  The insured's proof must attain a threshold "specificity necessary to recover against an insurer for bad faith."[8]  "[A] motorist is 'legally entitled' to damages if the motorist meets his or her burden of presenting substantial evidence to survive a motion for a summary judgment or a judgment as a matter of law and the fact-finder is reasonably satisfied from the evidence that the motorist should recover damages."[9]  The insured, then, must present the insurer substantial evidence supporting his demand, evidence that would avoid summary judgment were suit to be filed.

And the insured must present substantial evidence to the insurer, not merely that some vague amount of damage was caused by the fault of the uninsured motorist, but that the full amount of damage he claims actually was (or will be) suffered, that it has the value he claims, and that it was (or will be) all proximately caused by the accident.  In *Quick*, the insurer advised the insureds they were "entitled to some payment under the uninsured motorist coverage and that the only matter to be resolved is the amount of payment," yet there was never a breach of contract as a predicate to bad faith because "*the amount of damages* had not been determined."  429 So. 2d at 1035 (emphasis added).  In *Beggs*, the wrongful death of the insured obviously entitled his estate to some recovery, but there could be no bad faith unless the administratrix offered the insurer adequate proof of what that recovery should be.  525 So. 2d at 1352-53.  In *LeFevre*, the insured "[c]learly … was entitled to some payment under the uninsured motorist coverage of the State Farm policy," but there could be no bad faith where "*the total*

---

[8] *LeFevre*, 590 So. 2d at 158; *Beggs*, 525 So. 2d at 1352-53.

[9] *Walker v. Guide One Specialty Mutual Insurance Co.*, 834 So. 2d 769, 772 (Ala. 2002); *accord Ex parte Safeway Insurance Co., Inc.*, 2013 WL 5506557 at *3 (Ala. 2013).

*amount of that entitlement* was not capable of being fully ascertained" as of the relevant date. 590 So. 2d at 157 (emphasis added).

The plaintiffs have not met their heavy threshold burden. The automobile policy has UIM policy limits of $100,000 for each plaintiff, and the umbrella policy has a $1 million limit. Total possible UIM benefits thus total $1.2 million. (Doc. 78 at 5). From their first correspondence with Allstate, the plaintiffs insisted that their damages exceeded these policy limits. (Doc. 89-2 at 22). Never, however, did the plaintiffs present Allstate with substantial evidence that they had experienced, or would experience, at least $1.2 million in damages proximately caused by the accident.[10]

The plaintiffs presented their case to Allstate by a series of letters, accompanied by medical records, income tax returns, business records and other documentation. (Doc. 87 at 21; Doc. 89-2 at 16-42). The first letter, dated March 15, 2011, claimed hard damages of approximately $460,000. (*Id*. at 16-22). The lion's share of these damages ($421,200) represented lost income from not participating in BP's Vessels of Opportunity ("VOO") program. The plaintiffs presented evidence that they had two eligible vessels and that they had applied to participate in the program before the accident. They asserted they had received a "hire call" on May 27, 2010 and that they would have been paid $2,200 a day for the larger vessel and $1,400 a day for the smaller vessel (including their services as captains), net of operating expenses, (*id*. at 18-19), but it does not appear that they presented any evidence to support these assertions.[11]

_____

[10] The plaintiffs make no argument that their bad faith claim should be evaluated separately for each policy or for each plaintiff. Therefore, to proceed with their bad faith claim, they must have presented Allstate with evidence that their combined damages, proximately caused by the accident, exceeded the full $1.2 million.

[11] The plaintiffs attached a "sample contract" to their letter, (Doc. 89-2 at 19), but the only contract presented to the Court does not reference pay rates, (*id*. at 5), and the plaintiffs rely on a BP fact sheet, not a sample contract, to show the pay rates. (Doc. 87 at 17; Doc. 89-2 at 6). As of July 14, 2011, the plaintiffs had not produced evidence reflecting the occurrence of, or the substance of, the May 27 "hire call." (*Id*. at 31).

Critically, the plaintiffs demanded payment for 117 days (June 1 – September 15, 2010) at these rates, (Doc. 89-2 at 19), yet they produced no evidence to support their assertion they would have been hired for such a prolonged period (or any period at all). Nor did they ever do so. Instead, they assert that Allstate should have gone out and found evidence to support their position. (Doc. 87 at 21). That would be nice but, as addressed above, the initial burden was on the plaintiffs to present Allstate with evidence to support their claim, not on Allstate to conjure it up on their behalf. Because they offered Allstate no such evidence, the plaintiffs did not prove their legal entitlement to recover any damages for lost VOO income.

In their final relevant correspondence in December 2011, the plaintiffs claimed to have experienced over $854,000 in hard damages. (Doc. 89-2 at 35). Almost half of this figure represents lost VOO income. The next largest figure is for lost profit and net loss from the plaintiffs' charter boat business. They provided Allstate with tax returns reflecting a historical profit from this venture, and they apparently provided a schedule reflecting a net loss in 2011, but they provided no evidence to support their assertion that their profit would have almost doubled but for the accident, (*id*.), or even that they would have turned a profit at all.[12]

The plaintiffs owned a racetrack, which they sold on or about July 1, 2011. (Doc. 89-2 at 34). In December 2011, the plaintiffs claimed $86,000 in lost income from their racetrack activities. (*Id*. at 35). It is unclear what if any evidence the plaintiffs provided to prove these asserted losses, but it is clear they were overstated, since they include $42,000 for Linda's losses in 2011 even though she could not possibly have earned above $21,000 in the six months before the racetrack was sold. (*Id*. at 34).

At best, then, the plaintiffs presented Allstate with evidence sufficient to support incurred economic damages of approximately $352,000. In order to have satisfied their

---

[12] The plaintiffs have identified no authority for the proposition that an injured party may not only recover lost profits from a business but may also be made whole for losses from that business. However, since Allstate does not question the proposition, neither does the Court.

threshold burden of proving their legal entitlement to $1.2 million, they would have to have presented Allstate with substantial evidence that their non-economic damages (pain and suffering) and future economic damages (medical expenses, lost income and profit) exceeded approximately $848,000.[13]  As of December 2011, over 1½ years after the accident, the plaintiffs' medical expenses totaled approximately $150,000.  (Doc. 89-2 at 35).  But the plaintiffs provided Allstate no evidence of what their future medical costs might be, only what their past treatment had been.  (*Id*. at 28).  As noted, the plaintiffs provided Allstate no evidence supporting any particular amount of future lost employment income or lost profit from business ventures.  And they have not explained how the mere receipt of medical records could provide Allstate substantial evidence that their pain and suffering would result in an award well north of half a million dollars.

In summary, under Alabama law the plaintiffs cannot pursue a bad faith claim against Allstate unless they provided Allstate with evidence sufficient to prove that their damages, proximately caused by the accident, exceeded $1.2 million.  The plaintiffs insisted to Allstate that such damages exceeded that amount, but they did not provide Allstate with evidence actually establishing that proposition.  Accordingly, their bad faith claim must fail at this threshold step.

The plaintiffs challenge none of the foregoing.  Instead, they point out, (Doc. 87 at 19-20), that the *LeFevre* Court identified certain "guidelines for everyone concerned to follow" when an "insured has notified [the insurer] of a claim under the [UIM] coverage provision of an automobile liability policy."  590 So. 2d at 160-61.  The "general rules" announced in *LeFevre* are as follows:

> 1.  When a claim is filed by its insured, the uninsured motorist carrier has an obligation to diligently investigate the facts, fairly evaluate the claim, and act promptly and reasonably.
> 2.  The uninsured motorist carrier should conclude its investigation within a reasonable time and should notify its insured of the action it proposes with regard to the claim for uninsured motorist benefits.
> 3.  Mere delay does not constitute vexatious or unreasonable delay

---

[13] The plaintiffs do not seek from Allstate any punitive damages they could have recovered from the uninsured motorist.  (Doc. 98 at 27-28).

in the investigation of a claim if there is a bona fide dispute on the issue of liability.

4. Likewise, mere delay in payment does not rise to the level of bad faith if there is a bona fide dispute on the issue of damages.

5. If the uninsured motorist carrier refuses to settle with its insured, its refusal to settle must be reasonable.

*Id*. at 161. The plaintiffs argue that Allstate violated the fifth rule because its "failure to tender damages asserted as a result of the inability [to] participate in the VOO claim amounts to a refusal by Allstate to reasonably settle." (Doc. 87 at 21).

The guidelines do not provide the plaintiffs a means of bypassing their threshold burden of showing they presented Allstate evidence that they are legally entitled to recover the full $1.2 million policy limits they demanded. As noted, the *LeFevre* Court, relying on *Quick* and *Beggs*, 590 So. 2d at 158, held that "the insurer and the insured occupy adverse positions until the uninsured motorist's liability is fixed; therefore, there can be no action based on the tort of bad faith based on conduct arising prior to that time, only for subsequent bad faith conduct." *Id*. at 159. Thus, the guidelines, even were they to be violated, could furnish no basis for a bad faith action unless the insured had already met its threshold burden of providing the insurer adequate evidence to establish the uninsured motorist's fault, the fact and amount of the insured's damages, and the causal relation between the two. At best, the guidelines indicate how the insurer should respond once the insured presents the insurer evidence of the requisite specificity to show he is legally entitled to recover from the uninsured motorist the full amount of damages he demands of the insurer.

Since, as discussed above, the plaintiffs did not provide Allstate the necessary evidence, the guidelines never come into play. But even had the plaintiffs done so, the guidelines would not assist them. The fourth guideline provides that delay in payment cannot support a bad faith action "if there is a bona fide dispute on the issue of damages." The *LeFevre* Court ruled that, "where the evidence of the extent of damages is disputed, the insured has not proven, of course, that he is 'legally entitled to collect,'" and he thus cannot recover for bad faith. 590 So. 2d at 160; *accord id*. at 162 (after noting there can

be no breach of contract or bad faith until the insured proves he is legally entitled to recover, holding that "because there was a legitimate dispute concerning the amount of damages," there was no viable claim for bad faith). That is, even if the insured presents evidence which, considered on its own and favorably to him, reflects his legal entitlement to recover the full complement of damages he seeks from the insurer, he still has not shown himself to be legally entitled to recover if other evidence, or holes in his own evidence, generate a legitimate dispute as to the quantum of damages proximately caused by the uninsured motorist.

As discussed in Part I.C, Allstate had a legitimate dispute with the plaintiffs over their claim for lost VOO profits. Therefore, liability was not "fixed" and the plaintiffs had not proved their legal entitlement to recover the damages claimed, dooming their bad faith claim. And since Allstate had such a legitimate dispute, its refusal to pay the plaintiffs on the VOO portion of their claim was reasonable.

### C. Debatable Reason.

As discussed in Part I.B, the plaintiffs cannot satisfy the special requirements uniquely applicable to bad faith claimants in the UIM context. Even could they do so, however, their bad faith claim would fail for the additional reasons that appear below.

A bad faith claim can be either "normal" or "abnormal." "In the 'abnormal' case, bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim." *White v. State Farm Fire & Casualty Co*., 953 So. 2d 340, 349 (Ala. 2006) (internal quotes omitted). The plaintiffs' bad faith claim is based exclusively on Allstate's alleged failure to investigate, (Doc. 87 at 1, 9, 20-22), and it thus falls on the abnormal side of the tree.

The longstanding elements of a bad faith claim are as follows: (1) "an insurance contract between the parties and a breach thereof by the defendant"; (2) "an intentional

refusal to pay the insured's claim"; (3) "the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason)"; (4) "the insurer's actual knowledge of the absence of any legitimate or arguable reason"; and (5) "if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *White*, 953 So. 2d at 348 (internal quotes omitted).

It has long been understood that the first four elements must be proved in order to establish a "normal" case of bad faith, while the fifth is an essential element only in the "abnormal" case. *E.g., White*, 953 So. 2d at 348. It has also been understood that, "[f]or a normal bad-faith claim to be submitted to the jury, the underlying contract claim must be so strong that the plaintiff would be entitled to a preverdict judgment as a matter of law." *Jones v. Alfa Mutual Insurance Co*., 1 So. 3d 23, 32 (Ala. 2008) (internal quotes omitted). In contrast, "the rule in abnormal cases dispensed with the predicate of a preverdict JML for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." *Id*. (internal quotes omitted). This led some to believe that the third element of a bad faith claim did not apply in abnormal cases. The Alabama Supreme Court, however, has recently put that argument to rest.

"Regardless of whether the claim is a bad-faith refusal to pay [normal case] or a bad-faith refusal to investigate [abnormal case], the tort of bad faith requires proof of the third element, absence of [a] legitimate reason for denial …." *State Farm Fire and Casualty Co. v. Brechbill*, 2013 WL 5394444 at *9 (Ala. 2013). "The existence of an insurer's lawful basis for denying a claim is a sufficient condition for defeating a claim that relies upon the fifth element of the insurer's intentional or reckless failure to investigate." *Id*. at *10 (emphasis omitted). Thus, "[a] bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the

time the claim was denied." *Id*. at *11. The *Brechbill* decision returns the Supreme

Court (if it ever left) to the rule expressed in *Weaver v. Allstate Insurance Co.*, 574 So. 2d

771 (Ala. 1990): "With regard to Weaver's allegation that Allstate intentionally failed to

adequately investigate the accident, we agree with the trial court that no triable issue was

presented on this issue, because we hold that Allstate's investigation established a

legitimate or arguable reason for refusing to pay Weaver's claim, which is all that is

required." *Id*. at 774.

The plaintiffs do not deny that *Brechbill* and *Weaver* represent controlling

Alabama law. On the contrary, they admit that "the premise that bad faith cannot exist

when a debatable reason for denying a claim exists … is true." (Doc. 87 at 8). The Court

therefore applies those decisions.[14]

The plaintiffs' bad faith claim is limited to two aspects of their hydra-headed

damages claim: (1) lost VOO income; and (2) Linda's right shoulder. (Doc. 87 at 9). As

to both, Allstate had a debatable reason to deny the claim in early 2012.

The VOO program was initiated shortly after the April 2010 BP oil spill. There is

evidence the plaintiffs, before the accident, applied to participate and took steps to ready

their vessels. There is also evidence they received a call in late May 2010, after the

accident, but there is no evidence that the caller offered or promised them a place in the

fleet.[15] And, as discussed in Part I.B, Allstate had no evidence how much the vessels

would have been used. The plaintiffs demanded payment for 117 days but offered

---

[14] In 2004, the Eleventh Circuit declined to follow *Weaver* on the grounds that "more recent cases … indicate that the Alabama Supreme Court has moved away from its reasoning in *Weaver*." *Mutual Service Casualty Insurance Co. v. Henderson*, 368 F.3d 1309, 1315 n.2 (11th Cir. 2004). *Brechbill* indicates that such movement was illusory but, in any event, *Brechbill* is now the "more recent case" and the Court, in the footsteps of *Henderson*, thus follows *Brechbill*'s unequivocal holding and reasoning.

[15] Even according to the plaintiffs, the non-evidentiary statements of counsel they presented Allstate did not reflect that they would have been hired but only that they "more likely than not" would have been hired, (Doc. 87 at 24), odds that leave it more than reasonably possible they would not have been hired.

nothing to support this figure. Even in this litigation, the plaintiffs' own witness has testified it would be "[a] hundred percent speculation" to predict how much any given vessel would be used. (Doc. 80-6 at 54). Even in this litigation, the plaintiffs base their position as to how much their vessels would have been used on the experience of two other captains – one of whom had his vessel used for only one month. (Doc. 87 at 17-18). Even in this litigation, the plaintiffs can do no better than claim a "bare minimum" of $99,400 in lost VOO income, (*id*. at 18), which works out to less than 25% of the $421,200 they demanded from Allstate.

These deficiencies on their own provided Allstate a debatable reason not to pay on the VOO aspect of the plaintiffs' claim,[16] but there is more. While the plaintiffs maintain they could not participate in the VOO program during the relevant period (June 1 – September 15, 2010) due to residuals from the accident, Allstate had reason to question that causal connection.

Patrick asserts he could not participate in the program due to neck and shoulder pain, dizziness, blurred vision and memory lapses. However, by late June he was able to spend a full day driving long distances and sitting in front of a computer. (Doc. 80-6 at 69). By early July, he was also performing yard work, and by late July and into August he was busy building garages at his home. (*Id*. at 73, 78, 82, 86). His complaints of neurological symptoms did not begin until several days after the accident, at which time he asserted he had struck his head on the steering wheel and lost consciousness. (Doc. 80-7 at 24). On the date of the accident, however, he had denied – both to the EMTs and to emergency room personnel – having head trauma or pain or losing consciousness. (Doc. 81 at 69, 107). Moreover, a head CT scan, MRI and EEG following his complaints were all negative. (Doc. 80-7 at 24).

---

[16] *Smith*, 956 So. 2d at 1167 (bad faith claim failed because the insurer "had a legitimate reason to dispute the extent of Smith's damages"); *Southeast Nursing Home, Inc. v. St. Paul Fire and Marine Insurance Co*., 559 F. Supp. 883, 889 (N.D. Ala. 1982) (bad faith claim failed because the parties' differing estimates of the insured's damages reflected the existence of a debatable reason).

Linda asserts she could not participate in the VOO program due to lower back and right shoulder pain. However, she told her physical therapist in July 2010 that her lower back pain was chronic, having persisted for years, (Doc. 88-2 at 17), and an MRI confirmed degenerative changes. (Doc. 80-7 at 26). She told her doctor in May 2010 that her right shoulder pain was an aggravation of a shoulder injury she had experienced several months previously, when a dog jerked on a leash. (*Id*.). Linda did not seek treatment at the scene or in the emergency room but first presented with complaints three days later. (*Id*.). Under these circumstances, Allstate had reason to question the causal connection between the accident and either Linda's asserted inability to participate in the program or her right shoulder symptoms and conditions generally.

The plaintiffs do not deny that the information possessed by Allstate – which included their medical records and their correspondence and that of their attorney – invested Allstate with debatable reasons to deny payment concerning VOO income and Linda's shoulder. Instead, they argue only that, had Allstate conducted a more thorough investigation – by speaking with health care providers and various individuals unknown to Allstate who had anecdotal information about the VOO program – it would have uncovered the information that the plaintiffs now rely on in support of their claim. (Doc. 87 at 19, 21, 24-26). Under *Brechbill*, however, this will not do. "'Alabama law is clear: … regardless of the imperfections of [the insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim.'" 2013 WL 5394444 at *11 (quoting *Weaver*, 574 So. 2d at 775).

## II. Breach of Contract.

The plaintiffs seek a wide assortment of damages. (Doc. 98 at 27-28). Allstate seeks dismissal of three categories: (1) lost profits from the sale of a racetrack; (2) lost income from the VOO program; and (3) lost future management fees and commissions. (Doc. 77 at 2; Doc. 78 at 3, 38-39).

## A. Sale of Racetrack.

The plaintiffs owned a majority interest in a racetrack. In August 2009, a portion of the property was sold, with the purchaser retaining a two-year option to purchase the remainder (including the racetrack) for $5.25 million. In July 2011, the property was sold for $3.5 million. The plaintiffs argue they may recover the $1.75 million difference from Allstate because the lower sales price was due to decreased business at the racetrack following the accident and because the decreased business was due to Patrick's restricted involvement in racetrack operations due to his injuries from the accident. (Doc. 87 at 32; Doc. 98 at 27).[17]

"As a general rule, in a personal injury action, the loss of the value of time or earning power of the plaintiff is the element to be considered in the measure of damages and evidence of lost profits is allowable only insofar as it is probative of loss of earning power." *Fitzpatrick v. Dean*, 177 So. 2d 909, 910 (Ala. 1965). In applying this rule, "profits represent the net gain made from an investment or from the prosecution of some business after the payment of all expenses incurred." *Id*. at 911 (internal quotes omitted). "As a general rule, therefore, recovery is not allowed for the loss of business or profits from invested capital or the labor of others no matter how prominent the injured person's part therein or how essential to its successful operation his connection with it may be." *Id*. (internal quotes omitted). Allstate, relying on *Fitzpatrick*, argues that the racetrack is an investment and that the plaintiffs are attempting improperly to recover lost profits on the sale of that investment. (Doc. 78 at 32). The Court agrees.

As noted, evidence of lost profits is admissible only to the extent probative of a personal injury plaintiff's loss of earning power. "[E]arnings are the fruit or reward of labor, the price of services performed …." *Fitzpatrick*, 177 So. 2d at 911 (internal quotes omitted). For employees, earnings are things such as wages and salaries. For business owners, who may be paid no wages or salary, recoverable earnings may consist of the

---

[17] Since the plaintiffs admit their interest in the racetrack was approximately 85%, their claim actually could not exceed $1.3 million. (Doc. 87 at 32).

profits they earn from the operation of the business, so long as those profits are "derived from personal effort, skill, or ability" of the injured party and not from "the labor of others." *Id*. (internal quotes omitted). Thus, "[w]e think it clear then that evidence of what the plaintiff lost as a result of being unable to perform his usual work in his business should not be excluded simply because such earnings are termed profits. Rather, the prevailing consideration is whether the profits are a product of personal effort of the plaintiff" and thus the equivalent of earnings. *Id*. at 912. Under this standard, the plaintiff business owner in *Fitzpatrick* could recover lost earnings, though termed "profits," where such profits corresponded directly to his personal sales production. *Id*. at 910, 912.

Among the many elements of damage the plaintiffs seek is payment of management fees and commissions that, but for the accident, they would have been paid in 2010 for services rendered to the racetrack business. (Doc. 98 at 28). Those fees and commissions presumably represent earnings – compensation for the services the plaintiffs rendered the business. The profit the plaintiffs claim they would have made on the sale of the racetrack, however, does not represent compensation from the business for services rendered in the operation of the business, comparable to wages or salary. Any lost profit on the sale thus is not probative of the plaintiffs' loss of earnings and thus may not be considered. It is instead "profits from invested capital," as to which "recovery is not allowed … no matter how prominent the injured person's part therein or how essential to its successful operation his connection with it may be." *Fitzpatrick*, 177 So. 2d at 911 (internal quotes omitted).

The plaintiffs concede that *Fitzpatrick* applies, (Doc. 87 at 26-27), but they offer no explanation how their demand for lost profits on the sale of the racetrack could survive its application. As discussed above, the Court concludes it could not.

### B. Participation in VOO Program.

Allstate argues that the plaintiffs' claim for lost income from the VOO program is also barred by *Fitzpatrick*. (Doc. 78 at 32-33). The plaintiffs respond that the income they lost is not profit but wages and so is recoverable under *Fitzpatrick*. (Doc. 87 at 26-28). The Court concludes the truth lies somewhere in the middle.

The exhibits on which the plaintiffs rely establish without contradiction or ambiguity that payments by BP for participation in the VOO program are of two types. First is payment for the "charter" or "hire" of the participating vessel under a "vessel charter agreement." (Doc. 89-2 at 5, 8). Second is payment for "crew services," including those of the vessel captains. (*Id*.). The plaintiffs intended to sign charter agreements and captain their own vessels, enabling them to receive both forms of payment.

The payments for crew services plainly constitute "the fruit or reward of labor, the price of services performed" and so are "earnings," the loss of which is potentially recoverable under *Fitzpatrick*. The payments for vessel hire, however, just as plainly constitute "profits from invested capital" (the vessels) and so cannot be recovered "no matter how prominent the injured person's part therein or how essential to its successful operation his connection with it may be." *Fitzpatrick*, 177 So. 2d at 911 (internal quotes omitted). The plaintiffs insist that "a multitude of personal skills and abilities" placed them in position to participate in the VOO program, but all they can identify is that they lived on the coast, owned two potentially qualifying vessels, and held appropriate licenses. (Doc. 87 at 28). This may show that the plaintiffs were prudent businesspersons, but it cannot convert payments for the rental of their vessels into payments for the rendering of personal services aboard those vessels.

The foregoing ruling eliminates most of the plaintiffs' claimed damages.[18] As to the remainder, Allstate reminds the Court that speculative damages are not recoverable.

---

[18] The plaintiffs seek $3,200 per day for vessel hire and $400 per day for captaining services. (Doc. 87 at 17). They also claim they would have received an extra $49,000 pop on

[]20

(Doc. 78 at 33).  Allstate is correct,[19] but it has not shown that this limitation is in play here.  Their only argument in this vein is that the number of days the plaintiffs would have participated in the program must be speculative because a witness for the plaintiffs stated that "[i]t would be … [a] hundred percent speculation" to say how many days the plaintiffs' vessels would have been used.  (Doc. 78 at 18, 38; Doc. 80-6 at 54).  But, as the plaintiffs point out, (Doc. 87 at 16-17), the same witness testified that all but one or two participating vessels (there were thousands) received pay for at least two weeks, that all who came in at the beginning of the program (which would have included the plaintiffs) worked at least a month or so, and that generally only recreational vessels were weeded out after the first month (the plaintiffs' vessels were not recreational).  (Doc. 80-6 at 57-58).  The plaintiffs also cite to the experience of two captains, one of whom worked a month and the other at least 2½ months.  (Doc. 87 at 17-18).  Allstate ignores this testimony and offers no authority for the proposition that no damages may be awarded when it is clear the plaintiffs have experienced a loss of at least a certain amount and there is evidence they may have experienced a loss of a greater amount.

"[A] jury cannot be left to speculate as to the amount of damages, but this does not mean that the plaintiff must prove damages to a mathematical certainty or measure them by a money standard.  Rather, he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference."  *Birmingham Coal & Coke Co. v. Johnson*, 10 So. 3d 993, 998 (Ala. 2008) (internal quotes omitted).  Allstate has failed to show that the plaintiffs' evidence does not satisfy this rule.

### C.  Future Management Fees and Commissions.

Allstate's presentation consists of the following:  "Additionally, the Joffrions' claims of lost profits arising from future management fees and commissions are also due

---

their first day, (Doc. 87 at 16-17), but any such payment presumably would not have been wages for their captaining services.

[19] *See, e.g., Gardner v. State Farm Mutual Automobile Insurance Co*., 842 So. 2d 1, 10 (Ala. Civ. App. 2002) (this is the rule generally in tort cases).

to be precluded. No evidence exists to support a recovery of either." (Doc. 78 at 38). It scarcely needs saying that such bald conclusions, unaccompanied by explanation, record citation or legal authority, fail to satisfy a movant's threshold burden on motion for summary judgment.

In its reply brief, Allstate attempts to move the needle, asserting that the plaintiffs "have failed to submit any proof" that the racetrack purchaser would have used their services but for the accident. (Doc. 93 at 12). This argument, omitted from Allstate's principal brief, comes too late to be considered.[20] At any rate, and as discussed in the introductory section concerning summary judgment procedure, the plaintiffs had no burden to submit any such proof until and unless Allstate first either demonstrated with record evidence that the purchasers would not have used the plaintiffs or pointed to some place in the record showing that the plaintiffs cannot produce any such proof. Since Allstate has never done so, the plaintiffs are under no obligation to respond.

## CONCLUSION

For the reasons set forth above, Allstate's motion for partial summary judgment is **granted** with respect to the plaintiffs' claim for bad faith, **granted** with respect to the plaintiffs' claim for lost income on the sale of the racetrack, and **granted** with respect to the plaintiffs' claim for lost income from the VOO program in the form of charter fees. These claims and portions of claims are **dismissed with prejudice**. In all other respects, Allstate's motion for partial summary judgment is **denied**.

DONE and ORDERED this 15th day of July, 2014.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[20] *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1330 n.8 (S.D. Ala. 2012) ("District courts, including this one, ordinarily do not consider arguments raised for the first time on reply.") (citing cases and explaining the underlying rationale). Allstate identifies no reason to depart from this well-established rule.